**MESA PETROLEUM CO., Plaintiff,**

v.

**AZTEC OIL & GAS COMPANY, Defendant.**

**Civ. A. No. 3–76–001–C.**

United States District Court, N. D. Texas, Dallas Division.

Jan. 9, 1976.

Donald L. Case, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., Perry O. Barber, Jr., John L. Jeffers, Jr., William C. Harvin, Baker & Botts, Houston, Tex., for plaintiff.

Talbot Rain, Stan McMurry, Steve Cochran, Rain, Harrell, Emery, Young & Doke, Dallas, Tex., for defendant.

## OPINION AND ORDER ON APPLICATIONS FOR TEMPORARY INJUNCTION AND OTHER RELIEF

HIGGINBOTHAM, District Judge.

### I.

#### Factual Background

Mesa Petroleum Company (Mesa) is a Delaware corporation with its principal office in Amarillo, Texas. Mesa asserts, under Section 14(e) of the Securities Exchange Act of 1934, [hereinafter 14(e)], claims to access to the identities and addresses of the stockholders of Aztec Oil & Gas Company (Aztec). Aztec, a Delaware corporation, maintains its principal offices in Dallas, Texas.

Mesa wants to acquire all of the 5,560,634 shares of Aztec's Common Stock, issued, outstanding and now traded on the New York Stock Exchange (Aztec stock). Of course, Aztec is subject to the reporting requirements of Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l* (SEA). Mesa's acquisitive ambitions became public when on January 2, 1976 Mesa filed with the Securities and Exchange Commission its Schedule 13D, as mandated by Section 13(d) and by Section 14(d) SEA, simultaneously announcing its willingness to purchase any and all Aztec stock for $22 per share net. A copy of the Schedule 13D was delivered to Aztec's Dallas office the afternoon of January 2, 1976. Mesa's offer received extensive publicity in *The Dallas Morning News* and *The New York Times* edition of Saturday morning, January 3, 1976, and in *The Wall Street Journal* on Monday, January 5, 1976. On December 30, 1975, the last day preceding the tender offer, Aztec stock closed at $15⅝ths per share. Thus, the tender offer is at a price of $6⅜ths per share over the last market quote before the tender.

Aztec's Board of Directors met on Saturday, January 3, 1976, and decided to oppose the tender offer. Later in the same day, Mesa contacted Aztec and requested Aztec's aid in communicating the tender offer to its slightly more than 8,000 holders of common stock, either by mailing Mesa's offering material at Mesa's expense, or by furnishing a shareholder list so that Mesa could do so. Aztec refused Mesa's request.

Aztec's Board of Directors then sent a letter dated January 5, 1976 to Aztec's shareholders, communicating the Board's opposition to the tender offer and urging them to reject the offer for various reasons. More pertinent here, the Board urged the shareholders "not to tender your shares to Mesa until more information about these matters is made available to you," without mentioning that the tender offer would expire January 13, while simultaneously denying Mesa access to the shareholder list so that Mesa could make available information about the offer directly to the Aztec shareholders.[1]

The opposition of Aztec's Board was reiterated in newspaper advertisements, including those appearing on Tuesday, January 6, 1976 in *The Dallas Morning News.*

### II.

#### The Claims

On Monday, January 5, 1976, the Original Complaint was filed in this suit,

---

1. Aztec did not inform its shareholders that it had denied Mesa access to the Aztec shareholder list.

wherein Mesa urged that under 14(e) SEA, Aztec should be enjoined either to mail to its stockholders Mesa's offering materials, or to deliver to Mesa a list of the stockholders, to not interfere otherwise with Mesa's planned communications and to not violate the Federal Securities Law.

On Wednesday, January 7, 1976, Mesa filed its First Amended Original Complaint, wherein Mesa asserted in addition that under 14(d) and 14(e) SEA, the Court should find that statements made in the letter of January 5 from Aztec to its shareholders were false and misleading and failed to disclose material facts necessary to make statements therein not false and misleading, and that the Court should enjoin any further violations by Aztec of the securities laws.

On January 7, 1976, Aztec filed an answer to the original complaint of Mesa,[2] denying all allegations of violations of 14(e) SEA, and urging that Aztec should not be required to participate in the mailing of Mesa's tender offer because the offering material contains false and misleading statements in violation of 14(d) and 14(e) SEA. Additionally, Aztec counterclaimed that the acquisition of Aztec's stock by Mesa would constitute a violation by Mesa of Section 7 of the Clayton Act, in that it would eliminate competition between Aztec and Mesa in the exploration for, production and sale of natural gas in the San Juan Basin of northwestern New Mexico. Aztec urged the court to deny the injunctive relief sought by Mesa (i. e., requiring Aztec to divulge its shareholder list); to enjoin Mesa's tender offer, or to enjoin Mesa from disseminating its offering materials without correcting the allegedly false and misleading statements; or, in the event that Mesa is not enjoined from acquiring all or part of Az-

tec's stock, to enjoin Mesa from voting any of Aztec's stock as a means of gaining control of the management or operations of Aztec, or effectuating a merger, pending determination of Aztec's claims under Section 7 of the Clayton Act.

## III.

### The Standards for Preliminary Injunctions

The usual standards for issuance of preliminary injunctive relief are applicable here. These include proof that an applicant will probably prevail upon a full trial of the merits. While this standard is variously phrased, such as "reasonably certain to prevail at trial," *Symington Wayne Corp. v. Dresser Industries, Inc.*, 383 F.2d 840, 841 (2d Cir. 1967), or a "clear showing of probable ultimate success," *Jacobsen Mfg. Co. v. Sterling Precision Corp.*, 282 F.Supp. 598, 603 (E.D.Wis.1968), or a "strong possibility of success," *Electronic Specialty Co. v. International Controls Corp.*, 296 F.Supp. 462, 469 (S.D.N.Y.1968), these differences are little more than semantical.

The discretion of the chancellor must be exercised against a background of illusive and ephemeral rights both of the litigants and the solicited shareholders. That is not to say that a target or tendering company's rights should in any manner be less because of the shortness of time for acceptance of the offer to purchase (although some adjustment may be proper in the case of a tendering company because, within certain limitations, the duration of the offer is within the control of the offeror); it is to say that in the fashioning of equitable decrees the reality of the marketplace must be kept in mind. It may be that more can be done now in the administering of Section 14(e) [and 14(d)] than la-

---

**2.** In the answer, Aztec questioned the standing of Mesa to sue under 14(e) SEA since it is not a stockholder of Aztec. The tender offeror's standing to sue the target company was recognized by the Fifth Circuit in *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974), when it cited with approval *Chris-Craft Industries, Inc.*

*v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973). Conversely, the target company's standing to sue for injunctive relief has been established in *H. K. Porter, Inc. v. Nicholson File Co.*, 482 F.2d 421 (1st Cir. 1971), also cited with approval by the Fifth Circuit in *Sargent, supra.*

ter. See, *Electronics Specialty Co. v. International Controls Corp.*, CCH Fed.Sec. L.Rep. ¶ 92,342 at p. 97,633 (2d Cir. June 24, 1967), cited Bromberg, *Securities Laws*, Section 1120 (hereafter Bromberg Section ——).

A second principle found in the litany of standards for review of an application for preliminary injunction is that the plaintiff must prove that denial of the requested relief would result in irreparable injury. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). *See also, Moore v. Greatamerica Corp.*, 274 F.Supp. 490, 493 (N.D.Ohio 1967); *Symington Wayne Corp. v. Dresser Industries, Inc., supra.* Finally, the courts have added as a measure, the "balancing of equities." This is probably no more than another means of expressing an ultimate conclusion that, all things considered, the final determined relief is proper.

There is a great overlap among these standards partly concealed by their seriatim listing. And with irreparable injury the overlap may be almost complete at least as to the "adequacy of the remedy at law" (complete enough to avoid a separate listing). If, for example, money damages can make the applicant whole, the remedy at law is adequate and the injury is not irreparable, e. g., *Walston & Co. v. Haven Industries, Inc.*, CCH ¶ 92,364 (S.D.N.Y.1969).

## IV.

### *Section 14(e)*

### *Securities Exchange Act of 1934*

Since 1968 regulation of the cash tender offer for equity securities has revolved around the Williams Act and its offspring of amendments and regulations. Before 1968, offers to purchase corporate shares for cash were regulated only by imaginative application of Rule 10b–5 and stock exchange provisions. As observed by Professor Bromberg, the Williams Act created three types of regulation: 1) disclosure of certain data relating to the offeror; 2) certain required terms in any proposal to purchase shares; and 3) prohibition against fraud in connection with a tender offer, taking the form of 14(e). Bromberg 6.3(111). 14(e) provides:

"It shall be unlawful for any person [1] to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or [2] to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." (paragraph numbers added)

It is the second clause of 14(e) upon which Mesa bottoms its present claim, contending that Aztec has frustrated Mesa's access to the Aztec shareholders by withholding the shareholder list or not mailing Mesa's offering materials to the shareholders at Mesa's expense. This frustration is said to be a ". . . fraudulent, deceptive, or manipulative act[s] or practice[s] in connection with [a] tender offer . . . or [a] solicitation of security holders in opposition . . ." 14(e) on its face is a kinsman of the proxy rules. Congress had that kinship in mind when it created the Williams Act. See, Loss, *The Role of Rule 10b–5 In Tender Offers, Securities Regulation and Transfer Report* (Special Report 1969). In fact, the Williams Act was an amendment to SEA Section 14. SEA 14 is captioned "Proxies", a circumstance which troubled some scholars in the field. See Bromberg, *Securities Law*, 6.3 (220). *See also, Electronic Specialty Co. v. International Controls Corp.*, 296 F.Supp. 462, 469 (S.D.N.Y.1968). While 14(e) and the proxy rules include both analogous and non analogous provisions, by its nature 14(e) enjoys a common purpose with the proxy rule—regulation of the information flowing to shareholders. That is, both the Williams

Act and Proxy rules guide the flow of data from the combatants to the decision-makers—the shareholders. Congress has made clear that a free flow of information to the shareholders best achieves the ultimate purpose of the security laws. *Rondeau v. Mosinee Paper Corp., supra*; *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974). In any event the proxy and tender provisions are sufficiently related that guidance from Congress and the courts with regard to one may shed light upon the other. The House Report on the 1934 Act stated:

> ". . . Inasmuch as only the exchanges make it possible for securities to be widely distributed among the investing public, it follows as a corollary that the use of exchanges should involve a corresponding duty of according shareholders fair coverage . . ."
> House Report No. 1383, 73rd Cong., 2d Sess. (1934), p. 14.

Moreover, we have been admonished by the Supreme Court in *J. I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), to be "alert to provide such remedies as are necessary to make effective the congressional purpose." And the Supreme Court wrote:

> "The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J. I. Case Co. v. Borak, supra*, at 431, 84 S.Ct. at 1559.

It is against this background of a strong Congressional directive of disclosure and free flow of information to the decision-makers that this court must determine whether in light of what Aztec and Mesa have and have not told the Aztec shareholders concerning the tender offer a more complete disclosure can be achieved by granting the requested relief. This determination is guided by the Fifth Circuit's proclamation that:

> "The [Williams] Act's remedy is to add to former regulatory methods as [sic] additional approach which requires

'full and fair disclosure for the benefit of *investors* while at the same time providing the offeror and management equal opportunity to fairly present their case.'" (citation omitted). *Sargent v. Genesco, Inc., supra*, at 769.

■ Certainly the refusal to produce a shareholder list is alone not a deceptive practice. Equally certain, however, is that a telling to Aztec shareholders by either Aztec or Mesa of less than the whole story would violate 14(e). 14(e) does not grant a right of access to a target company's shareholder list. If, however, the suffrage rights of Aztec's shareholders have been abused, this court's broad injunctive powers are sufficient to control the means of communicating with the shareholders to the extent necessary to set the record straight. And if the best means of doing so is access to Aztec's shareholder list, there is little question but that the court's remedial power is adequate.

As we become immersed in the complexities of this case with the charges and countercharges between Aztec and Mesa, we must keep in the foreground the principle that the shareholders are the primary concern. As stated by Justice Burger:

> "The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp., supra*, 95 S.Ct. p. 2075.

## V.

## DISPOSITION OF THE CLAIMS

### A. Shareholder List and Nondisclosures

Both Mesa and Aztec charge that the other has made less than candid statements to Aztec shareholders. Both claim that the lack of candor stems from affirmative misstatements and omissions. Aztec, in a lengthy memorandum brief,

cites a large number of such. Ironically, it is difficult to understand how much of such omitted data could be effectively communicated by general publication as distinguished from a mailing to Aztec shareholders. This catalogue of omissions includes claims that Mesa has not only not revealed enough about itself but has made an inadequate disclosure concerning Aztec to Aztec shareholders. Apart from the rather curious posture in which this argument would place Aztec (such as whether it is on the one hand admitting that its management knows less about its company than its competitor, or on the other hand admitting that it does possess information[3] which it has not revealed), this is illustrative of the claimed omissions. However, that observation should not be taken as suggesting that the allegations of omission by both the combatants are insubstantial.

■ The moving papers of the parties, the evidence and argument suggest to this court that the opportunity to inform the shareholders of Aztec of the positions both of Aztec and Mesa can best be served hereafter by granting Mesa access to the Aztec shareholder list. Given the limitations of time, the potential benefits of this course can hardly be realized. Accordingly, the decree to be fashioned must condition that relief upon an extension of the tender period, with all its correlative rights, such as the right of tendering shareholders to withdraw. With more time and greater access to the shareholders, hopefully many of the claims of inadequate disclosure will die in the marketplace. The court is mindful of the admonition of Judge Wisdom in *Smallwood v. Pearl Brewing Company* that

> ". . . we cannot accept the premise that prior disclosure in one communication will automatically excuse omissions in another . . ."
> 489 F.2d 579, 605 (5th Cir. 1974).

However, a shareholder may, if he chooses, in the light of additional information which presumably will be furnished to the shareholders, change his mind.

■ Aztec has urged that because Mesa plans to merge Aztec with either Mesa or a subsidiary of Mesa, the tender offer is more closely akin to an exchange for stock than a cash tender offer. The inescapable fact, however, is that this is a cash tender offer within the meaning of the Williams Act. While this court is concerned with the adequacy of the disclosure by Mesa of Mesa's financial condition, as well as the means by which Mesa plans to discharge the debt incurred if the tender is successful, the court is of the opinion that Aztec has failed to demonstrate a likelihood of prevailing upon a trial on the merits, and has failed to demonstrate that any injury is irreparable, or, otherwise stated, that the right to sue for damages is not adequate.

Because virtually all of Aztec's assertions regarding Mesa's 14(e) violations concern omissions, discovery could alter the present state of affairs. Hypothetically, discovery might reveal that Mesa has failed to disclose some circumstances necessary to make what it has disclosed not misleading. Any conclusion that this court's present refusal to halt the tender offer constitutes some species of judicial insulation from future claims that the statements made to the shareholders have to date been full and complete should not be hastily drawn. This court is sitting in equity and this decree is in part the product of a balancing exercise made possible by the possible extension of the time of the tender offer and the greater access to the Aztec shareholders, for which an extension is the price, in the hope that both Aztec and Mesa will heed the admonition of this court—to not walk the baselines of their respective duties to disclose, but to be liberal in their communications.

**3.** One may properly ask why information in the hands of Mesa regarding the affairs of Aztec is sufficiently material to trigger a duty of Mesa to disclose but is insufficient to trigger a duty of Aztec; particularly in view of the arguments of Mesa that the 10b–5 and 14(e) duties are in their compulsions, of equal dimension.

This order is without prejudice to future application from either of the parties should this opportunity for increased communication to the shareholders, as provided by this decree, not be properly utilized, or should the discovery develop new information. Should Mesa choose not to extend the offer and utilize the shareholder list, the balance of equities may need to be reexamined because this court has assumed in its balancing exercise that Mesa wants what it states it wants—greater access to the Aztec shareholders. This court is mindful of· the myriad economic factors which could foreclose such an extension and trusts that if such are relied upon they can be proved to have been substantial and concrete.

### B. Antitrust

■ Aztec's request for a temporary restraining order based on its assertion that a successful tender offer would result in a violation of Section 7 of the Clayton Act must be denied. While there are serious questions with regard to the standing of Aztec to level these charges, see *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974), it is not necessary to resolve that question now because Aztec has not otherwise met its burden at this stage of the proceeding. From the papers before the court, there is little likelihood of Aztec prevailing at a trial on the merits.

Assuming the area of competition to be the San Juan Basin,[4] Aztec's own figures reveal respective production percentages of 1.7 and 6, for an aggregate percentage of 7.7% of production for Mesa and Aztec in the ˙San Juan Basin. This would hardly raise the eyebrows of the Justice Department. *See,* Merger Guidelines of the Department of Justice, CCH Trade Reg. ¶ 4510 at 6884. More-

over, Aztec's proposed definition of a geographical market would not likely be so narrowly drawn after a trial on the merits. Fortunately, it is not necessary at this juncture to consider the interlaced network of gas line distribution against the more narrow market definitions of such cases as *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1305–06 (5th Cir. 1971) and *Denver Petroleum Corp. v. Shell Oil Co.*, 306 F.Supp. 289, 304 (D.C.Colo.1969) arising in other contexts. This is not necessary because even if the market were drawn as proposed, Aztec has still failed to meet its burden.

Given the shortness of time, the circumstance that the merger is horizontal and discovery might disclose more, there is some temptation to restrain Mesa, pending further order, from exercising the voting rights of any stock acquired in response to the tender offer. This would have the consequence of leaving the eggs unscrambled pending further exploration of the issues. But as earlier stated, the focus must be upon the shareholders. And even those cases finding standing to sue in a target corporation suggest that the shareholders are the beneficiaries of the corporate stature. At least it is a duty to them which is cited in justification of corporate standing. As stated by Judge Miller in *Copperweld Corp. v. Imetal*, 403 F.Supp. 579 (W.D.Pa.1975):

> "In essence the party with the paramount interest in this suit is the shareholder and, in the absence of a compelling reason, we do not believe that one's right to deal with *his* property in the market place should be abridged. The tenuous possibility of divestiture does not present such a compelling reason given the circumstances of this case. In balancing the equities the Court firmly believes that the scale

---

4. The focus of competition for gas production in the San Juan Basin itself has probably come and gone. There is no suggestion that it has exploration underway or contemplated. Under the Natural Gas Act, one cannot terminate the existing service without leave of the Federal Power Commission. *See,* 15 U.S.C. § 717f(b). Regardless, competition between Aztec and Mesa in the San Juan Valley is not great.

does not tip in plaintiff's favor." 403 F.Supp. at 608.

Instead, the court is of the opinion that the lesser remedy of an expedited discovery program will suffice. If in the process of discovery Aztec can develop and cure these deficiencies, there may well be time enough for the court to act to avoid any possible antitrust violations.

In sum, tailoring the decree to suit the case in its present posture is not unlike the difficulties faced by a tailor with a one-leg, one-arm fat customer. The cloth has been cut today in the way deemed best by this court. This suit may not leave here in sartorial splendor but it will be, hopefully, less ragged than it was upon its arrival such a short time ago. Accordingly, for the reasons above stated, it is ordered, adjudged and decreed as follows:

1. All relief sought by Mesa and Aztec is denied except as hereafter provided:

a) If the tender offer of Mesa with all its terms and conditions conformed to the new time period is promptly extended for a period of not less than ten (10) days from its present expiration date, Aztec will promptly either mail to its stockholders Mesa's offering materials, or deliver to Mesa a list of such stockholders so that Mesa can issue such mailing, all at Mesa's expense;

b) The application for an order temporarily restraining Mesa insofar as it is based upon claimed violations of the antitrust laws is hereby denied; provided, however, there will be a trial on the merits to be commenced within forty-five (45) days of the date of this order, at a time to be scheduled by the court after conference with the parties; and

c) A program for accelerated discovery upon all issues will be adopted. The parties will meet with each other and present to the court not later than 10 o'clock A.M. Saturday, January 10, 1976, their proposed discovery plans.

2. This order shall apply to each and every officer, agent, employee or representative of Mesa or Aztec.

3. This order in its entirety is stayed until 1:00 o'clock P.M. January 9, 1976 to allow either party to seek appropriate appellate review.